CHARLES CARREON, ESQ. (127139)
2165 S. Avenida Planeta
Tucson, Arizona 85710
Tel:  520-841-0835
Fax: 520-843-2083
Email: chas@charlescarreon.com

Attorney pro se for Defendant Charles Carreon

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHRISTOPHER RECOUVREUR,

               Plaintiff,

      v.

CHARLES CARREON,

               Defendants.

CASE NO.  3:12-CV-03435 RS

**CORRECTED RESPONSE TO PLAINTIFF'S MOTION FOR ATTORNEY'S FEES**

        Defendant Charles Carreon hereby requests that the Court deny the motion of plaintiff for an award of award of attorney's fees.

        This response is based on the attached Memorandum of Points and Authorities and the facts set forth in the Declaration of Charles Carreon.

Dated:  March 19, 2013

CHARLES CARREON, ESQ.

s/Charles Carreon/s
CHARLES CARREON (127139)
Attorney pro se for defendant

TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................... i

I.       INTRODUCTION ............................................................................................................ 2

II.      ARGUMENT .................................................................................................................... 5

    A.   The American Rule Governs This Action ........................................................................ 5

    B.   The Supreme Court Has Made It Clear That Different Fee Statutes Impose Different
         Standards for Awarding Fees ........................................................................................... 7

    C.   The Declaratory Relief Statute Has No Fee-Shifting Provision ...................................... 9

    D.   The Lanham Act Fee Statute, 15 U.S.C. § 1117, Was Adopted To Benefit Markholders,
         And Its Provisions Cannot Be Asserted In An Action Where Trademark Holders Are Not
         Contending With Each Other ......................................................................................... 10

    E.   Converting A "First Amendment Shield" Into A "Lanham Act Sword" Would Give
         Gripe-Site Operators Greater Protection Than Trademark-Holders Enjoy And Allow Fee
         Awards For Unregistrable, Scandalous Speech .............................................................. 11

    F.   The Lawyer's Statements Were Protected by The Litigation Privilege of Cal. Civil
         Section 47(b), That Precludes Any Imposition Of Liability On the Lawyer For The Act of
         Sending A Threatening Email ........................................................................................ 13

    G.   If The Lanham Act Were Deemed To Apply To This Case, It Could Not Be Considered
         An "Exceptional" One .................................................................................................. 14

       1.   The Lawyer Raised No Claims Whatsoever, and Certainly Made No Frivolous
            Contentions In This Litigation.................................................................................. 15

       2.   The Lawyer Had Adversarial Options, And His Decision Not To Exercise Them In
            This Litigation Cannot Transform It Into An Exceptional Case ................................ 15

    H.   The Civil Rights Fee Statute, 42 U.S.C.  1988, Is *Sui Generis*, And The Laffey Index
         Does Not Apply to This Action...................................................................................... 16

    I.   If Fees Could Be Awarded, They Would Have to Be Very Modest................................ 16

III.     CONCLUSION ............................................................................................................... 17

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

On June 18, 2012, Plaintiff Christopher Recouvreur (the "Gripesite Operator") secretly registered the domain name Charles-Carreon.com and built a website (the "Gripesite") that published an image of defendant Charles Carreon (the "Lawyer") on which the Lawyer holds the copyright.  (Carreon Dec. ¶ 2.)  The Gripesite purported to be the Lawyer's own diary.  (Carreon Dec. ¶ 3.)  The Lawyer contacted Register.com, the domain name registrar, and threatened to sue Register.com if it did not disclose the Gripesite Operator's identity.  (Carreon Dec. ¶ 4.)  The Gripesite Operator contacted Los Angeles lawyer Ken White,[1] who contacted Paul Levy ("Levy"), who called the Gripesite Operator and retained him as a client under an oral agreement.  (Carreon Dec. ¶ 4.)

Levy called the Lawyer and told him to leave off bothering the Gripesite Operator, and followed up with an email trumpeting Levy's victories in a couple of cases on behalf of other gripesite operators.  (Carreon Dec. ¶ 6.)  The Lawyer wrote Levy back an email that threatened to sue the Gripesite Operator.  (Carreon Dec. ¶ 7.)

Levy filed this declaratory relief action naming the Gripesite Operator as a Doe plaintiff, alleging no damages, and asking for a declaration that the Gripesite Operator's "domain name and accompanying web site do not violate Carreon's rights under the trademark laws, and that any trademark claims are forbidden by the First Amendment."  (First Amended Complaint, hereinafter, the "FAC," Docket # 15, ¶ 1, pages 1:26 – 2:1.)

The Lawyer, who lives in a house in Tucson, Arizona behind a locked gate, declined to accept service of process.  (Carreon Dec. ¶ 9.)  The Lawyer had a phone conversation with a

---

[1] White, a criminal defense lawyer with a Libertarian following, derides other lawyers at Popehat.com as "Censorious Asshats."  http://www.popehat.com/2012/12/26/vote-in-the-second-annual-popehat-censorious-asshat-of-the-year-poll/  White conceived a special dislike for the Lawyer, recruiting readers to play a "Twitter hashtag game: #charlescarreonnewcareers," and recruited them as an "Army of Davids" to "take a screenshot or print … to pdf [any] web page" showing that the Lawyer had made "an inconsistent statement [or] shows hypocrisy."  (Carreon Dec. ¶ 5; Exhibit 1.)  When served with a subpoena for documents in this case, White responded with the disclosure that he had exchanged over 200 emails with the Gripesite Operator, and refused to produce anything, claiming that the Lawyer possesses "animus" towards White.  (Carreon Dec. ¶ 5; Exhibit 2.)

process server who called the telephone number posted on the Lawyer's gate and told him he didn't want the papers the process server wanted to deliver.  (Carreon Dec. ¶ 10.)  The Lawyer returned all envelopes received from Levy unopened by return mail.  (Carreon Dec. ¶ 11.)  The Gripesite Operator filed a motion seeking to deem service accomplished, that the Court denied. (Docket # 28.)

On November 15, 2012, the Gripesite Operator served the Lawyer.  (Carreon Dec. ¶ 13.) Eighteen days later, on December 3, 2013, the Lawyer tendered a Rule 68 Offer of Judgment ("OOJ") to settle the action for a stipulation sufficient to assure the Gripesite Operator that the Lawyer would never sue him for using the Gripesite as a gripesite, and a "total money judgment inclusive of costs in the amount of $725, being the sum of the filing fee and service costs claimed."  The OOJ expressly stated that it was tendered "without waiving any defenses or conceding any claims, or that any valid claim is stated by the operative complaint, or that defendant is liable in any manner whatsoever…"  (Exhibit 3.)

The OOJ remained open by statute for fourteen days, during which certain procedural jostling occurred.  Although Levy granted the Lawyer an extension of time to respond to the FAC, he refused to extend time for the Lawyer to respond to a motion for costs of service pursuant to Rule 4(d)(2)[2] that the Gripesite Operator had filed the day after the Lawyer served the OOJ, because Levy wanted "to see any arguments that defendant may have about the claim for fees before advising plaintiff about his response to the offer of judgment."  (Opposition to Motion for Extension of Time to Respond to Motion for Award of Service Expenses and Attorneys Fees, Docket # 35, page 3, lines 22 – 25.)  When the Court granted the Lawyer's ex parte request for an extension of time to respond to the Costs Motion (Docket # 37), Levy signed and filed the OOJ, that appears as Docket # 38.  (Carreon Dec. ¶ 14.)[3]  Levy repeatedly requested payment of the $725 judgment, and the Lawyer paid it.  (Carreon Dec. ¶ 14.)

---

[2] On January 23, 2013, the Court vacated the hearing date for the motion.  (Minute entry, *sans* Docket number.)

[3] On January 7, 2013, the Clerk of Court entered judgment on the terms set forth in the accepted OOJ.  (Docket # 44.)

On December 31, 2013, Levy filed a motion for attorney's fees, claiming an hourly rate for himself of $700/hour, and seeking over $40,000 in fees.  (Docket # 42.)  After the Lawyer requested additional time to conduct discovery, the Court extended the Lawyer's date to file opposition to March 18, 2013.  (Docket # 48.)

The Lawyer propounded Requests for Admissions, Interrogatories, and a Document Request to the Gripesite Operator, took the Gripesite Operator's deposition, and obtained documents from Levy's employer, the Public Citizen Litigation Group.  (Carreon Dec. ¶ 15.) The discovery results are referenced herein by the following abbreviations: Responses to Requests for Admissions ("RRFA # _"), documents subpoenaed from Public Citizen Litigation Group ("PCLG Documents page _"), and Gripesite Operator's deposition "GO Depo. _:_".)[4]

The discovery disclosed that:

o   The Gripesite Operator is not a journalist.  (RRFA #1.)

o   The Gripesite Operator is not a web developer.  (RRFA # 2.)

o   The Gripesite Operator had not received permission to use the Lawyer's name or photograph on the Gripesite.  (RRFA # 5 and #6.)

o   The Gripesite Operator created the Gripesite to "show support for the Oatmeal[5]." (GO Depo. __:__; Carreon Dec. ¶ 18.)

o   The Gripesite had a link to TheOatmeal.com, where Matt Inman media products were offered for sale.  (RRFA # 9 and # 10.)

o   The Gripesite directed Internet traffic to the Bear Love campaign, that raised over $220,024.  (RRFA # 13.)

o   The Gripesite Operator has gained no pecuniary benefit from this lawsuit. (GO Depo. __:__; Carreon Dec. ¶ 18.)

---

[4] Excerpted discovery results are attached as Exhibits numbered as follows: Responses to Requests for Admissions (Exhibit 4) and documents subpoenaed from Public Citizen Litigation Group (Exhibit 5).  The deposition transcript in final form has not yet been prepared, and given the paucity of information obtained from the plaintiff, obtaining an expedite was not worthy of the expense; accordingly, citations to the deposition cannot be provided at this time.  (Carreon Dec. ¶ 18.)

[5] TheOatmeal.com is a website operated by Internet cartoonist Matt Inman. http://theoatmeal.com.

- o The Gripesite Operator has no trademark rights in the "Charles Carreon" mark. (RRFA # 3.)

- o The redacted fee agreement produced by Levy states in relevant part:

- o "Unlike some cases, such as civil rights cases, cases like this one do not provide any guarantee of attorney fees. However, we may be able to seek an award of fees. We may seek to have such fees awarded to us, and you agree to support our request in that regard. If we obtain an award of attorney fees by court order or settlement, you agree that our office is entitled to those fees." (PCLG Documents pages 1 -2.)

- o The Gripesite Operator flew to Washington D.C. from California, to attend his deposition at the PCLG office, and was to be reimbursed for his plane fare by PCLG. (GO Depo. __:__; Carreon Dec. ¶ 18.)

## II.   ARGUMENT

### A.   The American Rule Governs This Action

In the absence of an applicable fee-shifting statute, the American Rule applies, and "litigants in the United States pay their own attorneys' fees, regardless of the outcome of the proceedings." *Camacho v. Bridgeport Fin., Inc.,* 523 F.3d 973, 978 (9th Cir. Cal. 2008).

The Supreme Court has spoken clearly on the subject, notably in the *Alyeska Pipeline* case, where it cautioned courts "that with the exception of the small amounts allowed by [28 U.S.C.] § 1923, the rule 'has long been that attorney's fees are not ordinarily recoverable....'" *Alyeska Pipeline Service Company v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).[6] Only a very small number of cases call for "judicially fashioned exceptions to the general rule against allowing substantial attorneys' fees."[7] *Alyeska Pipeline,*

---

[6] The Court's quote is from *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 718-20, 87 S. Ct. 1404, 18 L. Ed. 2d 475 (1967), a Lanham Act case reversing a fee award made without statutory authority. As discussed *infra*, Congress took up the cause of markholders and amended the Lanham Act in 1975, giving *registered markholders* the right to recover attorney's fees in "exceptional cases," that have been defined by the Ninth Circuit as cases where the litigants acted "fraudulently" or in "bad faith."

[7] "[A] court may assess attorneys' fees for the 'willful disobedience of a court order . . . as part of the fine to be levied on the defendant [citations omitted] or when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons….' [Citations omitted.]" 421 U.S. at 258.

421 U.S. at 258.  The Court cautioned that Congress had not "extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted."  *Alyeska Pipeline,* 421 U.S. at 261.  The Court declared that, although "Congress has not repudiated the judicially fashioned exceptions to the general rule against allowing substantial attorneys' fees," neither has it "modified the limitations on taxable fees contained in" Section 1923, that it characterized as having the specific purpose of protecting losing parties from paying the winner's fees:

> "In 1853, Congress undertook to standardize the costs allowable in federal litigation. In support of the proposed legislation, it was asserted that ***there was great diversity in practice among the courts and that losing litigants were being unfairly saddled with exorbitant fees for the victor's attorneys. The result was a far-reaching Act*** specifying in detail the nature and amount of the taxable items of cost in the federal courts. ***One of its purposes was to limit allowances for attorneys' fees that were to be charged to the losing parties.***"
>
> *Alyeska Pipeline,* 421 U.S. at 251 – 252.  (Emphasis added.)

Thus, as a matter of Congressional intent, the costs statute itself operates as a check and limit on the Federal Courts' ability to award fees.  The American Rule is statutory, and the best of intentions and the most remarkable results cannot bend it.  The *Alyeska Pipeline* opinion is a monument to that unbending principle, and cannot be ignored in any policy discussion regarding a proposed award of fees under a novel theory lacking a statutory or precedential basis.

In *Alyeska Pipeline*, the prevailing parties defending the award of fees they had received were wearing the whitest of hats.  The Wilderness Society, the Environmental Defense Fund, and Friends of the Earth had gone to court to protect the Alaskan wilderness, filing suit "in an attempt to prevent the issuance of permits by the Secretary of the Interior which were required for the construction of the trans-Alaska oil pipeline."  *Alyeska Pipeline*, 421 at 241.[8]  The defendants were daunting litigants – the United States and a consortium of oil companies.

---

[8] The plaintiffs had alleged that the Secretary would be acting "in violation of § 28 of the Mineral Leasing Act of 1920, 41 Stat. 449, as amended, 30 U.S.C. § 185.5 and without compliance with the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, 42 U.S.C. § 4321 et seq."  *Alyeska Pipeline*, 421 at 242.

*Alyeska Pipeline*, 421 at 241.  The results of the litigation were noteworthy.[9]  But none of it made any difference to the Supreme Court, because the statutes under which suit had been filed did not provide for any award of attorney's fees.  Congress defines the limits of this field of judicial activity, and the courts must operate within statutory bounds:

> "[T]he rule suggested here … would make major inroads on a policy matter that Congress has reserved for itself. Since the approach taken by Congress to this issue has been to carve out specific exceptions to a general rule that federal courts cannot award attorneys' fees beyond the limits of 28 U.S.C. § 1923, those courts are not free to fashion drastic new rules with respect to the allowance of attorneys' fees to the prevailing party in federal litigation or to pick and choose among plaintiffs and the statutes under which they sue and to award fees in some cases but not in others, depending upon the courts' assessment of the importance of the public policies involved in particular cases."

*Alyeska Pipeline,* 421 at 269.

**B.      The Supreme Court Has Made It Clear That Different Fee Statutes Impose Different Standards for Awarding Fees**

Congress lays out the rules for awarding attorney's fees in federal lawsuits in order to encourage certain types of litigation in certain ways.  As the Supreme Court state in *Alyeska Pipeline*:

> "What Congress has done, however, while fully recognizing and accepting the general rule, is to make specific and explicit provisions for the allowance of attorneys' fees under selected statutes granting or protecting various federal rights. ***These statutory allowances*** are now available in a variety of circumstances, but they ***also differ considerably among themselves***."

*Alyeska Pipeline,* 421 at 260.  (Emphasis added.)

The seminal case that helps to sort out the application of fee-shifting statutes in the intellectual property field arose from a dispute between the Sixties rockstar John Fogerty of Credence Clearwater Revival and his former record company, Fantasy, Inc.  When Fogerty released "The Old Man Down the Road," Fantasy sued, alleging he'd merely added new words

---

[9] "The Court of Appeals… held that respondents had acted to vindicate 'important statutory rights of all citizens…;' had ensured that the governmental system functioned properly; and were entitled to attorneys' fees lest the great cost of litigation of this kind, particularly against well-financed defendants such as Alyeska, deter private parties desiring to see the laws protecting the environment properly enforced."  *Alyeska Pipeline*, 421 at 245 – 246.

to his old hit "Run Through the Jungle," on which Fantasy held the copyright. *Fogerty v. Fantasy, Inc.,* 510 U.S. 517 (1984). When Fogerty won, however, the District Court and the Ninth Circuit denied him an award of attorney's fees, sticking to the "dual standard" interpretation of the copyright fee-shifting statute, 17 U.S.C. § 505, that tilted the table in favor of prevailing plaintiffs, and against prevailing defendants. *Fogerty,* 510 at 520 – 521.

The Supreme Court reversed, and its explanation for why it reversed will help the Court here to avoid falling into the error that into which plaintiff seeks to lead it by basing the bulk of its argument on *Blum v. Stenson,* 465 U.S. 886 (1984) and other Civil Rights cases awarding fees under 42 U.S.C. 1988 ("Section 1988").

In *Fogerty*, the Ninth Circuit had reasoned that, because Congress used the same operative language in both Section 505 and in the fee-shifting provision of Title VII of the Civil Rights At, 42 U. S. C. § 2000e-5(k) ("in its discretion, [the court] may allow the prevailing party . . . a reasonable attorney's fee as part of the costs"), that Title VII precedents could guide its reasoning when interpreting the application of Section 505. *Fogerty,* 510 at 523. But the Ninth Circuit was wrong. The Supreme Court explained that the fact that the fee-shifting table is tilted toward successful plaintiffs in sex discrimination cases does not mean that the same language tilts the table towards successful plaintiffs in copyright cases:

> "Respondent points to our language in *Flight Attendants v. Zipes*, 491 U. S. 754, 758, n. 2 (1989), that 'fee-shifting statutes' similar language is a `strong indication' that they are to be interpreted alike.' But here we think this normal indication is overborne by the factors relied upon in our Christiansburg opinion that are absent in the case of the Copyright Act. The legislative history of § 505 provides no support for treating prevailing plaintiffs and defendants differently with respect to the recovery of attorney's fees."

> *Fogerty*, 510 U.S. at 523.

Thus, when plaintiff cites *Blum v. Stenson* for the principle that public interest lawyers working *pro bono* should be paid market rates, it leads this Court astray. The Supreme Court's adoption of a "market rate" for calculating attorney's fees in Civil Rights cases was explicitly grounded in its construction of Section 1988. "***Resolution of these … arguments [about how to calculate a reasonable of attorney's fee] begins and ends with an interpretation of the***

*attorney's fees statute.*"  *Blum,* 465 U.S. at 893.  (Emphasis added.) And Section 1988, that gives plaintiffs private rights of action to remedy acts of officials acting under color of law, has an entirely different remedial rationale than the Declaratory Relief statute under which plaintiff here has sued.  Judicial interpretations based on Section 1988's particular legislative history cannot be imported to analyze fee-shifting issues under other statutes.  Indeed, as is discussed *infra*, they could not be imported into Lanham Act jurisprudence without causing grave injury to the rights of markholders and upsetting the balance of rights established by Congress.

But even construing this case to be a Lanham Act case would be an error.  It is simply a declaratory relief case.

## C.   The Declaratory Relief Statute Has No Fee-Shifting Provision

This action was filed under the Declaratory Relief statute, 28 U.S.C. § 2201.  Federal Rule of Civil Procedure 57 provides that "[t]hese rules govern the procedure for obtaining a declaratory judgment."  The Notes of the Advisory Committee on the Rules state:

> "The fact that a declaratory judgment may be granted 'whether or not further relief is or could be prayed' indicates that declaratory relief is alternative or cumulative and not exclusive or extraordinary. A declaratory judgment is appropriate when it will 'terminate the controversy' giving rise to the proceeding. *** The existence or nonexistence of any right, duty, power, liability, privilege, disability, or immunity or of any fact upon which such legal relations depend, or of a status, may be declared. The petitioner must have a practical interest in the declaration sought and all parties having an interest therein or adversely affected must be made parties or be cited. A declaration may not be rendered if a special statutory proceeding has been provided for the adjudication of some special type of case, but general ordinary or extraordinary legal remedies, whether regulated by statute or not, are not deemed special statutory proceedings."

The Declaratory Relief statute has no fee-shifting provision, and since under Rule 57 the Federal Rules of Civil Procedure "govern the procedure for obtaining a declaratory judgment," it is clear that the only cost-shifting allowed under a declaratory relief claim is that provided by Rule 54, granting costs under subsection (d)(1).  Declaratory relief cases simply go by the American Rule.  "Under California law, an insurer does not owe fees incurred by its insured in defending a declaratory judgment action on coverage." *Allstate Ins. Co. v. Barnett,* 2011 U.S. Dist. LEXIS 12815 (N.D. Cal. Feb. 9, 2011), *citing United Services Auto. Ass'n v. Dalrymple,*

232 Cal. App. 3d 182, 187, 283 Cal. Rptr. 330 (1999).  There is no provision for recovery of fees in a declaratory relief action, and no fee award can be made in this case.

>    **D.    The Lanham Act Fee Statute, 15 U.S.C. § 1117, Was Adopted To Benefit Markholders, And Its Provisions Cannot Be Asserted In An Action Where Trademark Holders Are Not Contending With Each Other**

Before Congress amended the Lanham Act in 1975, the Supreme Court applied the American Rule in Lanham Act cases, denying fees to prevailing parties.  "Although courts have a general power in equity to award fees as part of the costs, particularly when the opposing party has acted in bad faith, vexatiously, wantonly or oppressively, [citations] the Supreme Court held that this power did not apply in Lanham Act cases because Congress acted to circumscribe the general powers of the courts by prescribing detailed remedies under section 35."[10]

Even under the 1975 amendment, the right to recover attorney's fees was granted only to *registered* marks.  Declining to "deem the omission an oversight," the Seventh Circuit sidestepped the issue of whether unregistered markholders could recover attorney's fees, and observed that, while "section 35 governs suits for infringement of a federally registered trademark … there is no corresponding provision in section 43(a), which protects unregistered marks."  *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.,* 781 F.2d 604, 612 (7th Cir. Wis. 1986).  More bold was the Eleventh Circuit, that remedied the "oversight" by allowing recovery of fees for unregistered marks in *Rickard v. Auto Publisher, Inc.*, 735 F.2d 450 (11th Cir. 1984) (extension of right to recover fees evinced Congressional intent to further consistent treatment of all protectable marks, and "to provide the greatest protection possible for all trademarks used in interstate commerce").  Several Circuits endorsed the logic of allowing unregistered markholders the right to recover attorney's fees. *Eg., Transgo, supra* at note 3, 768 F.2d at 1026.

***Importantly, the same logic militates against extending the right to seek attorney's fees to non-markholders.***

---

[10] *Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1026 (9th Cir. Cal. 1985), overruled on other grounds, *Bellevue Manor Assocs. v. United States*, 165 F.3d 1249, 1256 (9th Cir. Wash. 1999), *citing Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718-20, 87 S. Ct. 1404, 18 L. Ed. 2d 475 (1967).

Allowing non-markholders to seek attorney's fees awards would not further the goals of consistent treatment of registered and unregistered marks, nor would it "provide the greatest protection possible for all marks used in interstate commerce."  On the contrary, allowing non-markholder gripesite operators to usurp the statutory rights of the markholders they sue for declaratory relief would benefit a class of persons Congress had no intent to benefit when it enacted the Lanham Act.  Worse still, it would expose markholders to litigation risks that would undermine the additional protection Congress intended to grant by giving registered markholders the right to recover attorney's fees in the 1975 amendment.  Such a result would be contrary to the tenets of statutory construction, and lead to great unfairness in the treatment of markholders engaged in litigation with gripesite operators, as discussed further below.

### E.  Converting A "First Amendment Shield" Into A "Lanham Act Sword" Would Give Gripe-Site Operators Greater Protection Than Trademark-Holders Enjoy And Allow Fee Awards For Unregistrable, Scandalous Speech

Gripesite operators are concededly protected from the application of trademark laws that would "impinge the First Amendment rights of critics." [11]  The broad scope of the First Amendment protects even "hurtful" speech whose "contribution to public discourse may be negligible," such as the anti-gay picketing of a soldier's funeral by religious extremists.[12]  However,  Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a) bars registration of any mark that "consists of scandalous matter that may disparage … persons, living or dead, institutions, beliefs, or national symbols" or brings them into "contempt or disrepute."  A mark is "scandalous" if it is "shocking to the sense of truth, decency, or propriety; disgraceful; offensive; disreputable; . . . giving offense to the conscience or moral feelings; . . . [or] calling out [for]

---

[11] "Congress … did not intend for trademark laws to impinge the First Amendment rights of critics and commentators."  *Lamparello v. Falwell,* 420 F.3d 309, 313 (4th Cir. Va. 2005).  First Amendment declaratory relief actions support attorney's fees awards under 42 U.S.C. § 1988 only against government entities or conspiracies to infringe civil rights.

[12] Church members allowed to display signs stating "'God Hates the USA/Thank God for 9/11,' 'America is Doomed,' 'Don't Pray for the USA,' 'Thank God for IEDs,' 'Thank God for Dead Soldiers,' 'Pope in Hell,' 'Priests Rape Boys,' 'God Hates Fags,' 'You're Going to Hell,' and 'God Hates You.'"  *Snyder v. Phelps,* 131 S. Ct. 1207, 1213 (U.S. 2011).

condemnation."[13]  Net-caricature often disparages "persons living or dead," and by deft avoidance of commercial use, empowers the caricaturist to utilize a registered mark for purposes inimical to the markholder's interests.   For example, the derisive epithet "Censorious Douchebag," posted at Charles-Carreon.com by the Gripesite Operator, would not merit registration.

"[T]he general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)."[14]  Thus, although an unregistered mark may be valid and protectable, an *unregistrable* mark, *i.e.,* a scandalous mark like "Censorious Douchebag," is *invalid* and *unprotectable*.[15]  An invalid mark could not provide the predicate for a meritorious infringement action, and thus could never provide the grounds for an attorney's fee award under 15 U.S.C. § 1117.[16]  ***Accordingly, it would turn trademark law on its head to grant the users of unprotectable marks standing to seek attorney's fees for defending their right to use unprotectable marks.***

If motions for attorney's fees like the pending one were authorized, then gripesite operators posting scandalous statements like "Thank God For Dead Soldiers" and "Thank God for IEDs" on websites like "AmericasLegion.com" and "ForeignWarVets.com,"[17] would have standing to move for attorney's fees in declaratory relief actions against the American Legion or the Veterans of Foreign Wars.  In search of fee awards, plaintiff's counsel and his public interest colleagues would be incentivized to sue those organizations on the slightest pretext.  ***In this way,***

---

[13] *In re Mavety Media Group,* 33 F.3d 1367, 1371 (Fed. Cir. 1994).

[14] *Wal-Mart Stores v. Samara Bros.,* 529 U.S. 205, 210 (U.S. 2000), *quoting Two Pesos v. Taco Cabana,* 505 U.S. 763, 768 (U.S. 1992).

[15] *Amazing Spaces, Inc. v. Metro Mini Storage,* 608 F.3d 225, 241 (5th Cir. Tex. 2010). *Compare* with cases allowing fee awards for unregistered, but protectable, marks, *eg., Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001.

[16] "A necessary concomitant to proving infringement is, of course, having a valid trademark; there can be no infringement of an invalid mark."  *Tie Tech, Inc. v. Kinedyne Corp.,* 296 F.3d 778, 783 (9th Cir. Wash. 2002), *citing Yarmuth-Dion, Inc. v. D'ion Furs, Inc.,* 835 F.2d 990, 992 (2nd Cir. 1987)  and 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 27:14 (4th ed. 2002).

[17] Both domains are currently available for registration.

*a "First Amendment Shield" would be improperly converted into a "Lanham Act Sword," placing trademark holders in a worse position than their antagonists, thanks to the very law intended to provide them with protection.*  Adding to the injury, the threat of fee recoveries for gripe-site operators would chill the First Amendment rights of markholders who respond to scandalous attacks on their marks with litigation threats, since litigation threats, that are as much entitled to First Amendment protection as derisive epithets, would provoke unique, negative pecuniary consequences.

### F.   The Lawyer's Statements Were Protected by The Litigation Privilege of Cal. Civil Section 47(b), That Precludes Any Imposition Of Liability On the Lawyer For The Act of Sending A Threatening Email

The foregoing argument is sufficient to dispose of the instant motion, because plaintiff's argument begins where the law ends.  The remainder of this brief addresses the substance of plaintiff's argument, assuming the erroneous basis upon which plaintiff's counsel has erected it.

Levy simply argues that after he warned the Lawyer that he couldn't win a cybersquatting lawsuit against the Gripesite Owner, the Lawyer was obliged to shut up.  When the Lawyer failed to shut up, and made a litigation threat, the Gripesite Owner acquired a claim for relief against the Lawyer, and the right to compel the Lawyer to pay the Gripesite Owner's attorney's fees.  In support of this argument, Levy cites all the cases he has won for other gripesite operators.  Quite simply, when Levy speaks on behalf of a gripesite operator, other lawyers just have to shut up.

Levy appears to be ignorant of the venerable California litigation privilege codified in Cal. Civil Code Section 47(b).  This is a remarkable blind spot for a lawyer who claims to be a $700 per hour free speech lawyer, because when deployed in a Motion to Strike under Cal. Code of Civil Procedure § 425.16, *i.e.,* a California Anti-SLAPP Motion, Cal. Civil Code 47(b) is one of the sharpest weapons in the California free speech litigator's toolbox.  In *Lopez Reyes v. Kenosian & Miele, LLP,* 525 F.Supp.2d 1158 (2007),[18] the opinion cites as "***a 'classic example' of a situation in which the litigation privilege would apply is an 'attorney demand letter***

---

[18] *Rubin v. Green,* 4 Cal.4th 1187, 17 Cal.Rptr.2d 828, 847 P.2d 1044 (Cal., 1993).

*threatening to file a lawsuit if a claim is not settled*.'"  Thus, far from doing something that could give rise to a lawsuit in California, the Lawyer was simply acting within the scope of the litigation privilege.

California law is clear on this point.  *See, Lerette v. Dean Witter Organization, Inc.,* 60 Cal.App.3d 573, 131 Cal.Rptr. 592 (Cal. App. 2 Dist., 1976).  The Lawyer's email to Levy was eminently defensible in this litigation as speech protected by the litigation privilege, and no liability could have arisen from it.  Indeed, the entire action might[19] have been subject to dismissal by way of an Anti-SLAPP motion.  *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman,* 54 Cal.Rptr.2d 830, 47 Cal.App.4th 777 (Cal. App. 2 Dist., 1996) (defamation action premised on lawyer's letter providing notice of intended legal action dismissed on Motion to Strike).

Thus, what plaintiff seeks by this motion, *i.e.,* to impose financial liability upon the Lawyer for sending a threatening email, is plainly barred by the litigation privilege codified in Section 47(b).[20]

### G.    If The Lanham Act Were Deemed To Apply To This Case, It Could Not Be Considered An "Exceptional" One

After the Supreme Court handed down *Fogerty, supra,* in *Stephen W. Boney v. Boney Services, Inc.,* 127 F.3d 821 (1997), the Ninth Circuit grappled with the question of what standard applied in Lanham Act cases when the prevailing defendant moves for attorney's fees, contending that it has litigated an "exceptional" case.  Clearly it means more than a hard-fought case between bitter adversaries, because Judge Fletcher described it as a case that "pits brother against brother in a battle for the family name … a family feud [in which we] suspect there is no real winner."  *Boney,* 127 F.3d at 821.  Plaintiff Stephen Boney filed seven claims against his brothers and lost on summary judgment.  *Id.*  His brothers sought an award of fees that District

---

[19] The uncertainty arises from the fact that anti-SLAPP motions do not apply to federal claims. *Bulletin Displays v. Regency Outdoor Advertising,* 448 F.Supp.2d 1172 (C.D. Cal., 2006).

[20] Ironically, Levy, the "First Amendment lawyer," is also attempting to use the Court to punish the Lawyer for exercising his right to speak freely by uttering legal threats.

Judge Enright denied, basing his opinion on *Fogerty*.[21]   The Ninth Circuit noted that "[t]he applicable standard, however, depends on the applicable statute," and, whereas 17 U.S.C. § 505 of the Copyright Act, "at issue in *Fogerty*, simply authorizes fee awards to the prevailing party …. Section 35(a) of the Lanham Act, on the other hand, ***requires exceptional circumstances***." *Boney,* 127 F.3d at 825 (emphasis added).   Accordingly, the Ninth Circuit upheld Judge Enright's denial of fees because Stephen Boney's case "***was not frivolous and raised debatable issues of law and fact***."   *Boney,* 127 F.3d at 825 (emphasis added), *citing Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 612 (7th Cir. 1986).

### 1.     The Lawyer Raised No Claims Whatsoever, and Certainly Made No Frivolous Contentions In This Litigation

The Lawyer made no claims on the merits in this action.   He therefore could not have made any frivolous contentions.   Throwing in the towel is not bad faith, and the party who prevails due to the other party's concession has not litigated an exceptional case.   *See Eagles, Ltd. v. American Eagle Foundation,* 356 F.3d 724 (6th Cir., 2004) (plaintiff's dismissal of the action shortly before trial did not turn the action into an exceptional case).

### 2.     The Lawyer Had Adversarial Options, And His Decision Not To Exercise Them In This Litigation Cannot Transform It Into An Exceptional Case

Levy appears to believe that simply because the Lawyer did not engage in adversarial exchanges, that the Lawyer had no defenses or counterclaims to allege.   As argued *supra*, the Lawyer had every right to send any litigation threat he chose under protection of the litigation privilege accorded by Cal. Civil Code § 47(b).   Additionally, under California law, the use of the Lawyer's name and likeness for commercial benefit without consent, would be unlawful.

> Civil Code section 3344, subdivision (a), provides in pertinent part as follows: "***Any person who knowingly uses another's name, photograph, or likeness, in any manner, for purposes of advertising products, merchandise, goods, or services, or for purposes of solicitation of purchases of products ... without such person's prior consent ... shall be***

---

[21] "The district court concluded in light of *Fogerty* that it had to evaluate BSI's motion under the same 'bad faith or malicious conduct' standard applicable to prevailing plaintiffs' motions under section 35(a)." *Boney,* 127 F.3d at 825.

> *liable for any damages sustained by the person ... injured as a result thereof.*"
>
> *Eastwood v. Superior Court,* 149 Cal.App.3d 409, 417 (1983) (unconsented use of name and likeness in magazine article).

In the *Eastwood* case, quoted above, the California Court of Appeals explored the scope of Section 3344 in some detail, emphasizing that "The statute imposes liability on a person 'who knowingly uses another's name, photograph or likeness, in any manner….'" *Eastwood,* 149 Cal.App.3d at 420.  Additionally, the Lawyer owned the copyright on his photograph, and the Gripsite Operator had no license to use it.  Thus, the Lawyer had adversarial options that he chose not to exercise.  His decision to give the Gripesite Operator what he sought in the lawsuit cannot transform this utterly mundane lawsuit into an exceptional case.

### H.    The Civil Rights Fee Statute, 42 U.S.C.  1988, Is *Sui Generis*, And The Laffey Index Does Not Apply to This Action

As discussed *supra*, this is not a Civil Rights case, and the Laffey Index has been utilized exclusively in Civil Rights cases.  Accordingly, calculating Levy's fees based on the Laffey Index would be inappropriate.[22]

### I.    If Fees Could Be Awarded, They Would Have to Be Very Modest

By Levy's efforts in this case, he has vindicated a legal principle that he claims is already well-established.  The sole benefit he has brought to the Gripsite Operator is the ability to operate the Gripsite.  There does not seem to be anything special about the Gripsite that will bring any benefit to the public.  If the Gripsite did not exist, the world would probably not notice its absence.  If PCLG is to take anything away from this case, it should be quite a modest amount, reflecting the value of the time Levy spent working for PCLG.  The FAC is the only important document he created that appears on the Court's docket.  It is a piece of work that would not take any accomplished attorney more than three hours to complete.  Thus, at most, an attorney's fee award of $200 would be all that has been earned by Levy's efforts.  No work by his co-counsel contributed to the result obtained in the case.

---

[22] Nor does there seem to be anything coherent about Levy's use of the Laffey Matrix.  In another case where he sought fees during calendar year 2011, his Laffey hourly rate was claimed as $575/hr.  (Exhibit 6.)

III.     **CONCLUSION**

The motion should be denied.

Dated: March 18, 2013                              CHARLES CARREON, ESQ.

                                                   /s/Charles Carreon
                                                   Charles Carreon (CSB 127139)
                                                   Attorney for Defendant Pro Se